IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 4, 2017

## IN RE KEN'BRIA B.

**Appeal from the Juvenile Court for Shelby County**
**No. CC1917     Harold W. Horne, Special Judge**

_____

### No. W2017-01441-COA-R3-PT

_____

This appeal concerns termination of a father's parental rights.  The Tennessee Department of Children's Services ("DCS") filed a petition in the Juvenile Court for Shelby County ("the Juvenile Court") seeking to terminate the parental rights of Kenneth F. ("Father") to his minor child Ken'bria B. ("the Child").  After a trial, the Juvenile Court entered an order terminating Father's parental rights to the Child.  Father timely appealed to this Court.  On appeal, Father argues, among other things, that he has an upcoming opportunity for parole and, therefore, the ground of incarceration for ten years or longer when the child is less than eight years of age should not apply.  We affirm the judgment of the Juvenile Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which ANDY D. BENNETT and KENNY W. ARMSTRONG, JJ., joined.

Alexandra Tallent, Memphis, Tennessee, for the appellant, Kenneth F.

Herbert H. Slatery, III, Attorney General and Reporter, and Michael C. Polovich, Assistant Attorney General, for the appellee, the Tennessee Department of Children's Services.

# OPINION

## Background

The Child was born in June 2014. Although Father was not listed on the Child's birth certificate, the Child's mother identified him as the father of the Child.[1] Father never filed a petition to establish paternity. In November 2014, the Child was placed in DCS's custody. In March 2015, the Child was adjudicated dependent and neglected.

In December 2013, Father was incarcerated. In February 2016, Father was sentenced to fifteen years in prison for, among other offenses, aggravated robbery. In February 2016, Father signed the Criteria and Procedures for Termination of Parental Rights. Father participated in a permanency plan, as well. On December 20, 2016, Father had a supervised visit with the Child. Father's visitation rights were suspended thereafter when drugs were found in his shared prison cell. Father denied owning the drugs. Father suggested that either his wife, Keitra F., or the Child's grandmother assume custody of the Child. Neither option ever materialized. Father's support for the Child has consisted of Christmas presents, cards, and assisting with a birthday party. The Child currently lives in foster care in the home of Kizzy J. ("Foster Mother"). The Child lives there with her two siblings, who already have been adopted by Foster Mother. In December 2016, DCS filed a petition in the Juvenile Court seeking to terminate Father's parental rights to the Child. This case was tried in June 2017.

Beverly Williams, DCS caseworker on the Child's case between November 2015 and September 2016, testified as follows:

> Q. Now, Ms. Williams, did you ever try to set up visits between the child and [Father] at 201?[2]
> A. Yes, I did.
> Q. Okay. And what happened with that?
> A. At the time that we tried to set that, he was -- I think he told me he was put in a hole where he couldn't have visits because of infractions.
> Q. Okay. Did he tell you why or specifically what the infractions were?
> A. No, he did not.
> Q. Okay. Did you ever receive any notification that he had gotten out of the hole and was able to have visits again?
> A. No, I did not.
> Q. And did you provide your contact information to [Father]?

---

[1] The Child's mother surrendered her parental rights and is not a party on appeal.
[2] 201 refers to Shelby County Correctional Center at 201 Poplar Avenue.

A. Yes, I did.

Q. Okay. And did your contact information change at all during the period of time that you had the case between November 2015 and September 2016?

A. No.

Father testified to his interactions with DCS and his participation in the case as follows, in part:

Q. And you said you were first incarcerated in 2014. Would that be correct?

A. It might have been '13.

Q. Did the Department ever visit you at 201?

A. Yes, ma'am.

Q. Do you remember who visited you?

A. Yes, ma'am.

Q. Who was the person?

A. Ms. Flowers and Ms. Betty is her name.

Q. Do you remember the first time they visited you?

A. Yes, ma'am.

Q. When was that?

A. That was when I got like a year after I had already been incarcerated, I would say around about in January, around about 2015.

Q. Did you ever receive any mail at 201 from DCS about court dates or court hearings?

A. No, ma'am.

Q. Did you ever receive any kind of notices saying you had a right to counsel during these proceedings?

A. No, ma'am.

Q. Were you ever served any orders from the Court giving you notice or continuances telling you court dates?

A. I was served one notice saying that I had to be transported to Juvenile Court for a hearing, but I was never transported down there.

Q. Did you have a counselor at 201?

A. Yes, ma'am.

Q. Okay. Were they able to assist you with any of this?

A. They was, but it wasn't no assistance.

Q. Did you have regular access to a phone at 201?

A. Yes, ma'am.

Q. What about mail?

A. Yes, ma'am.

-3-

Q. And when they -- I believe it was Ms. Williams when she testified a few minutes ago that she had you sign the criteria for the termination of your rights. Did you understand what you were signing?

A. Yes, ma'am. She talked to him and let me know everything that was going on because I was at work, and then by this being my first time ever going through this situation, I didn't know what was going on or how to deal with this situation at the time. But she had told -- she had read me my rights and then, you know, let me how what was all going on.

Q. Did you make it -- did they ask you to surrender at that time?

A. They asked me -- they asked me, but I turned it down.

Q. Did you request visits with your child?

A. Yes, ma'am. The first time I found out about the issue -- I didn't know my daughter was in custody in the whole -- she had been in custody for about six or seven months, I didn't even know period, what was going on. Then I just noticed that my daughter wasn't coming to visit no more. My mother and my daughter, my sister and them go get my baby from my baby mama every weekend and bring her up here to see me. I noticed that the visits weren't coming no more. So, I was like wondering what was going on. My momma didn't know what was going on because Alexis, she lives in her own house. She do her own thing, so --

Q. Alexis is the mother?

A. Yes, ma'am.

Q. Okay. You heard them testify that you couldn't get visits at 201 because you were in the hole; is that correct?

A. I didn't do all my time in the hole. I just had got placed in the hole for a couple of days, but I had access to visits all the time and she told me about the visit. I asked her about the visits first time that I seen her. She had told me that they couldn't deal with me, period, until the blood test came back. So that's what made me so -- that big of a gap in between them saying my mother wasn't present. I wasn't present. It was just that big gap. We was waiting on the blood test.

Q. Did you ever receive a copy while you were at 201 of the results?

A. No, ma'am.

Q. Have you ever received a copy of it?

A. No, ma'am. I just got a copy, like, last month.

***

Q. Okay. And during this time were you requesting visits with your child?

A. Yes, ma'am.

Q. And how did you try to support your child from jail?

-4-

A. Anyway that I can. Anything that I could. I tried to contact, getting in touch with her. So I can just have -- just hear her voice over the phone or whatever I could do, whatever I could do for my daughter, I would do it. I was doing it.
Q. What about financially? How did you try to support her? Did you give her gifts or -
A. Yes, ma'am. Clothes, gifts, anything that I could give, I give.
Q. How did you send those?
A. Through the case worker. My wife had to call -- to get in contact with the case workers and they would get it from her and then I guess they would give it to her later.

In July 2017, the Juvenile Court entered its final order terminating Father's parental rights to the Child. The Juvenile Court found and held by clear and convincing evidence as follows, in pertinent part:

7. Pursuant to T.C.A. § 36-1-113(g)(6), Respondent [Father] has been confined to a correctional facility, as the result of a criminal act, under a sentence of ten (10) or more years, and the child was under eight (8) years of age at the time the sentenced was entered. [Father] has been sentenced to two fifteen-year sentences; one six-year sentence; and one sentence of eleven months and twenty nine days by order of the Shelby County Criminal Court for the criminal acts of aggravated robbery (two counts), felon in possession of a firearm, and evading arrest. The judgments were entered by Shelby County Criminal Court on February 23, 2016, and [the Child] was under eight (8) years of age at the time the sentences were entered. Prior to the entry of the judgments, Family Service Worker Beverly Williams that she met with [Father] on February 9, 2016, and he signed the Criteria and Procedures for Termination of Parental Rights. (See Exhibit 4, Criminal Record for [Father]; and Exhibit 6, Criteria and Procedures for Termination of Parental Rights.)
8. Pursuant to T.C.A. § 36-1-113(g)(9)(A) et seq., as defined in T.C.A. § 36-1-117, Respondent [Father] is not the legal father of [the Child] and did not voluntarily file a petition to establish paternity prior to the filing of the petition to terminate parental rights. Although [Father] has completed DNA testing that shows he is the biological father of the child, he has not established paternity of the child and is therefore a putative father pursuant to the wording of the amended statute, which became effective March 23, 2016. (See Exhibit 5, DNA Test Results.)
9. Pursuant to T.C.A. § 36-1-113(g)(9)(A)(iii), Respondent [Father] has failed, without good cause or excuse, to seek reasonable visitation with the

-5-

child.  Testimony presented revealed that [Father] has seen the child one time since she entered foster care in November 2014, and that visit took place in December 2016 at the Hardeman County Correctional Facility. [Father's] visitation was suspended after that visit because contraband in the form of drugs was found in his cell.  [Father] attributed the presence of the contraband to his cellmate.  Prior to December 2016, former Family Service Worker Beverly Williams testified that she visited [Father] in early 2016 at the Shelby County Correctional Center at 201 Poplar Avenue (popularly known as "201" or "201 Poplar"), and [Father] informed her that could not visit with [the Child] because he was in "the hole."  In contrast, [Father] stated he was only in "the hole" for a short period of time while at 201 Poplar, and nobody at the Department took affirmative steps to set up visitation between him and [the Child] once he was out of the "hole." [Father] also stated that he has regular access to the telephone and mail services while incarcerated.  The Court finds that [Father] had an obligation to seek out and establish visitation, but he took no steps to do so despite having the ability to make telephone calls and send letters to the Department.

10. Pursuant to T.C.A. § 36-1-113(g)(9)(A)(iv), Respondent [Father] has failed to manifest an ability and willingness to assume legal and physical custody of the minor child.  [Father] and the child have no bond; and it would be harmful to the child to remove the child from the current placement and place the child with [Father].  The Court finds that [Father] has shown "some" willingness, he has no ability to take custody of the child at this time due to his incarceration.  [The Child] has established a strong bond with her foster mother, foster siblings, and birth siblings.  The Court finds that [Father] simply has no ability to seek custody of the child at this time due to his incarceration.  Although he wishes to gain custody of the child at some point in the future, he will likely not be in a position to take custody of her anytime in the near future.

11. Pursuant to T.C.A. § 36-1-113(g)(9)(A)(v), placing custody of the child in Respondent [Father's] legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. [Father] and the child have had minimal contact, and she is well-bonded to the foster mother, her two foster siblings, and her two birth siblings. [Foster Mother] testified that [the Child] is doing well in her home, and she wishes to adopt the child if she becomes available for adoption.  [Foster Mother] has already adopted [the Child's] birth siblings.  Youth Villages foster care counselor Monica Bentley testified that she has been involved in the case on and off for some time, and she believed a change in custody at

this juncture would be traumatizing to [the Child] due to the length of time she has been in her foster home.

12. Pursuant to T.C.A. § 36-1-113(g)(9)(A)(vi), Respondent [Father] has failed to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity by the child's mother, or as required in T.C.A. § 36-2-318(j), or after making a claim of paternity pursuant to T.C.A. § 36-1-117(c)(3). [Father] was aware of his alleged paternity of [the Child] before the Department gained custody of the child in November 2014, and he failed to take any steps to file a petition to establish paternity. [Father] had a legal obligation to establish this legal relationship between himself and his child.

\*\*\*

14. Specifically, the Court makes the following findings of fact that termination is in the child's best interest in regard to the father [Father] under the following factors set out in the statute:

a. Pursuant to T.C.A. § 36-1-113(i)(1), [Father] has not made an adjustment of circumstance, conduct, or condition as to make it safe and in the child's best interest to be in his home. [Father] has been incarcerated since December 2013, and although he testified that he is set for parole in January 2018, the appeal of his two fifteen-year sentences for aggravated burglary may not be resolved for three to six months. It is unclear when or if [Father] will be in a position to take custody of the child in the future.

b. Pursuant to T.C.A. § 36-1-113(i)(2), [Father] has had little contact with the Department and has failed to effect a lasting adjustment after reasonable efforts by the Department to the extent that lasting adjustment does not reasonably appear possible. The Department set up DNA testing, attempted to schedule visitation while [Father] was at the Shelby County Correctional Center, and started visitation with [Father] at the Hardeman County Correctional Facility prior to their suspension.

c. Pursuant to T.C.A. § 36-1-113(i)(3), [Father] has had infrequent visitation or other contact with the child since she was born. [Father] was able to visit with the child in December 2016, but the visitation ceased after contraband was found in his cell. [Father] attributed the contraband (specifically drugs) to his cellmate, but his visitation rights were suspended nonetheless.

d. Pursuant to T.C.A. § 36-1-113(i)(4), a meaningful relationship has not been established between [Father] and the child. [Father] has had minimal contact with the child and a bond has not formed as a result.

e. Pursuant to T.C.A. § 36-1-113(i)(5), a change of caretakers and physical environment would have a negative effect on the child's emotional, psychological, and medical condition. The child has bonded strongly to the foster mother and a change in placement would adversely affect her. [The Child] has only seen [Father] one time since she entered foster care in November 2014, and she is well-bonded to [Foster Mother] as well as her two foster siblings and two birth siblings (now adopted by [Foster Mother]).

f. Pursuant to T.C.A. § 36-1-113(i)(6), the Court finds no proof that [Father] or someone living with him has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household.

g. Pursuant to T.C.A. § 36-1-113(i)(7), the Court finds that the physical environment of [Father's] home is unhealthy and unsafe, there is criminal activity in the home, or there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent consistently unable to care for the child in a safe and stable manner. [Father] is currently incarcerated due to criminal activity, and discussions regarding unification of the child with [Father] cannot be contemplated until he is released. His wife, Keitra [F.], testified that she has a criminal history involving charges of burglary and theft.

h. Pursuant to T.C.A. § 36-1-113(i)(8), the Court finds that no proof that [Father's] mental and emotional status would be detrimental to the child or prevent him from effectively providing safe and stable care and supervision for the child.

i. Pursuant to T.C.A. § 36-1-113(i)(9), although [Father] has provided some in-kind support for the child, he has not paid child support for the child consistent with the child support guidelines.

Father timely appealed to this Court.

### Discussion

Although not stated exactly as such, Father raises the following issues on appeal: 1) whether the Juvenile Court erred in finding the ground of incarceration on a sentence of ten or more years when the Child is under the age of eight years old at the time of sentencing; 2) whether the Juvenile Court erred in finding that the putative father grounds apply to Father; 3) whether the Juvenile Court erred in finding the ground of failure to seek reasonable visitation with the Child; 4) whether the Juvenile Court erred in finding the ground of failure to manifest an ability and willingness to assume legal and physical custody of the Child; 5) whether the Juvenile Court erred in finding the ground of risk of

substantial harm to the physical or psychological welfare of the Child should she be placed in Father's custody; 6) whether the Juvenile Court erred in finding the ground of failure to legitimate after 30 days' notice; and, 7) whether the Juvenile Court erred in finding that it is in the Child's best interest to terminate Father's parental rights.

As our Supreme Court has instructed regarding the standard of review in parental termination cases:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[3] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(I)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and

---

[3] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[4] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is

---

[4] Tenn. Code Ann. § 36-1-113(g)(1)-(13).

separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[5] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n.15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

---

[5] Tenn. Code Ann. § 36-1-113(i).

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered).

Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Our Supreme Court, however, has instructed "that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26 (footnote omitted). As such, we review each of the grounds for termination.

Tenn. Code Ann. § 36-1-113(g)(6) (2017) provides as a ground for termination of parental rights the following: "The parent has been confined in a correctional or detention facility of any type, by order of the court as a result of a criminal act, under a sentence of ten (10) or more years, and the child is under eight (8) years of age at the time the sentence is entered by the court." Tenn. Code Ann. § 36-1-113(g)(9)(A)(iii)-(vi), part of the so-called putative father grounds, provides:

The parental rights of any person who, at the time of the filing of a petition to terminate the parental rights of such person, or if no such petition is filed, at the time of the filing of a petition to adopt a child, is the putative father of the child may also be terminated based upon any one (1) or more of the following additional grounds:

\*\*\*

(iii) The person has failed to seek reasonable visitation with the child, and if visitation has been granted, has failed to visit altogether, or has engaged in only token visitation, as defined in § 36-1-102;

(iv) The person has failed to manifest an ability and willingness to assume legal and physical custody of the child;

(v) Placing custody of the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child; or

(vi) The person has failed to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity, or as required in § 36-2-318(j), or after making a claim of paternity pursuant to § 36-1-117(c)(3);

Tenn. Code Ann. § 36-1-113(g)(9)(A)(iii)-(vi) (2017).

We first address whether the Juvenile Court erred in finding the ground of incarceration on a sentence of ten or more years when the Child is under the age of eight years old at the time of sentencing. Father testified that he has appealed his convictions and that he has an upcoming opportunity for parole in January 2018. This Court, however, has stated previously that courts "need not look beyond the judgment of conviction and the sentence imposed by the criminal court in order to determine whether this ground for termination applies." *In re Audrey S.*, 182 S.W.3d 838, 876 (Tenn. Ct. App. 2005). We also have stated: "[T]he possibility of early parole is not a sufficient basis to negate this statutorily-defined ground." *In re Jaceton B.*, No. M2014-01580-COA-R3-PT, 2015 WL 1517779, at \*3 (Tenn. Ct. App. March 30, 2015), *no appl. perm. appeal filed*. In this case, certified copies of Father's convictions were entered into the record. It is undisputed that Father received two fifteen-year sentences for aggravated robbery. The Child was under eight years of age at the time of sentencing. Therefore, the necessary elements for this ground have been established conclusively. We find, as did the Juvenile Court, that the ground of incarceration on a sentence of ten or more years

when the Child is under the age of eight years old at the time of sentencing was proven by clear and convincing evidence.

We next address whether the Juvenile Court erred in finding that the putative father grounds apply to Father. A putative father is defined by statute as follows: " 'Putative father' means a biological or alleged biological father of a child who, at the time of the filing of a petition to terminate the parental rights of such person or, if no such petition is filed, at the time of the filing of a petition to adopt a child, meets at least one (1) of the criteria set out in § 36-1-117(c) and is not a legal parent." Tenn. Code Ann. § 36-1-102(43) (2017). Tenn. Code Ann. § 36-1-117(c) provides as relevant:

> (c) The parental rights of the putative father of a child who has not filed a petition to establish paternity of the child or who has not established paternity of the child who is the subject of an adoption proceeding and who meets any of the following criteria shall be terminated by surrender, parental consent, termination of parental rights pursuant to § 36-1-113, or by waiver of interest, before the court may enter an order of adoption concerning that child:
>
> ***
>
> (2) The biological father has been specifically identified to the petitioners or their attorney, or to the department, the licensed child-placing agency, or the licensed clinical social worker involved in the care, placement, supervision, or study of the child as the child's father by the child's biological mother in a sworn, written statement or by other information that the court determines to be credible and reliable;
>
> (3) The biological father has claimed to the child's biological mother, or to the petitioners or their attorney, or to the department, a licensed child-placing agency, or a licensed clinical social worker who or that is involved in the care, placement, supervision, or study of the child that the biological father believes that the biological father is the father of the child; provided, that if the biological father has previously notified the department of the biological father's claim to paternity of the child pursuant to the putative father registry, § 36-2-318(e)(3), the biological father shall be subject to all the requirements for waiver of notice provisions of § 36-2-318(f)(2) and to all requirements for filing a paternity petition;

Tenn. Code Ann. § 36-1-117(c)(2017).

-14-

Father argues that "[Father] never signed the agreement page of the permanency plan . . ." and that therefore "[Father] cannot be held accountable for failure to legitimate his child when he had no notice of the permanency plan requirements." Father argues further that DCS should have presented Father with a voluntary acknowledgement of paternity to sign and that its failure to do so means it failed to exercise reasonable efforts. However, DCS generally is not required to prove reasonable efforts as a precondition for the termination of parental rights under most grounds for termination. *In re E.C.*, No. E2016-02582-COA-R3-PT, 2017 WL 2438574, at *8 (Tenn. Ct. App. June 6, 2017), *no appl. perm. appeal filed*. (citing *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015)). As relevant to this issue, the Juvenile Court found:

> The biological mother named [Father] as the father of the child. The biological mother provided no other credible and reliable information concerning the father's identity pursuant to T.C.A. § 36-1-117(c)(2). The putative father registry was consulted and revealed no claims to paternity of the child; and no one else has claimed to be the father or to know the father.

> ***

> Respondent [Father] is not the legal father of [the Child] and did not voluntarily file a petition to establish paternity prior to the filing of the petition to terminate parental rights. Although [Father] has completed DNA testing that shows he is the biological father of the child, he has not established paternity of the child and is therefore a putative father pursuant to the wording of the amended statute . . . .

The evidence does not preponderate against these findings made by the Juvenile Court. We find, as did the Juvenile Court, that Father is a putative rather than legal father, and that the putative father grounds apply to Father.

We now address whether the Juvenile Court erred in finding the ground of failure to seek reasonable visitation with the Child. The record reflects that Father had only one DCS-supervised visit with the Child. Father testified to visiting perhaps twice with the Child before she entered DCS custody. The record establishes that although Father had means of communication with DCS while incarcerated, he nevertheless did not pursue these lines of communications to garner more visitation time with the Child. Regardless of how long he was in "the Hole," Father failed to take affirmative steps to visit with the Child. We find, as did the Juvenile Court, that the ground of failure to seek reasonable visitation with the Child was proven by clear and convincing evidence.

The next issue raised is whether the Juvenile Court erred in finding the ground of failure to manifest an ability and willingness to assume legal and physical custody of the Child. We note that in his testimony, Father stated many positive things about his willingness to be a father to the Child. We believe, however, that manifesting an ability and willingness to assume legal and physical custody of a child must amount to more than mere words. Father neither has been proactive in working with DCS, nor has Father cultivated a genuine relationship with the Child. Father instead has occasionally given the Child various minor gifts and engaged in highly limited visitation. Even considering the limitations placed upon Father while he was incarcerated, we find he has not taken actions sufficient to manifest an ability and willingness to assume legal and physical custody of the Child. We find, as did the Juvenile Court, that the ground of failure to manifest an ability and willingness to assume legal and physical custody of the Child was proven by clear and convincing evidence.

We next address whether the Juvenile Court erred in finding the ground of risk of substantial harm to the physical or psychological welfare of the Child should she be placed in Father's custody. Father argues that DCS failed to prove any real hazard or danger to the Child should she be placed in Father's custody. We are cautious on this ground not to equate Father's incarcerated status directly with the threat of substantial harm. Indeed, this Court has explained: "We have never held that a parent's mere status as an inmate clearly and convincingly establishes that placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." *In re E.C.*, 2017 WL 2438574, at *9. In the present case, however, the Juvenile Court relied upon more than Father's incarceration. Testimony in the record establishes the strong bond between the Child and her foster family. Father does not dispute this. Placing the Child with Father would, therefore, mean severing a strong bond between the Child and her foster family by placing the Child with someone, Father, she barely has met. We find, as did the Juvenile Court, that the ground of risk of substantial harm to the psychological welfare of the Child should she be placed in Father's custody was proven by clear and convincing evidence.

The last issue as to grounds is whether the Juvenile Court erred in finding the ground of failure to legitimate after 30 days' notice. Father concedes that he never filed a petition to legitimate the Child. Father's only argument as to this issue is that he was incarcerated and that he was unsure how to initiate proceedings. We find this argument unavailing. Just as incarceration is not, by itself, a basis for terminating parental rights, incarceration is not a legitimate excuse for all manner of parental neglect of responsibilities. An incarcerated parent, although undeniably facing hardships in jail, may still do some things including making at least some attempt to legitimate his child. We find, as did the Juvenile Court, that the ground of failure to legitimate after 30 days' notice was proven by clear and convincing evidence.

The final issue we address is whether the Juvenile Court erred in finding that it is in the Child's best interest to terminate Father's parental rights. Tenn. Code Ann. § 36-1-113(i) provides:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (2017).

The Juvenile Court's detailed findings, analyzing each statutory best interest factor, are quoted above. The evidence does not preponderate against the Juvenile Court's findings relative to this issue. A particularly weighty factor in this case is (5), pertaining to the likely effect of a change in caretakers. The Child is in a stable, bonded family unit, and deserves permanence moving forward. We find by clear and convincing evidence, as did the Juvenile Court, that termination of Father's parental rights is in the Child's best interest. The judgment of the Juvenile Court is affirmed in its entirety.

## Conclusion

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Kenneth F., and his surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE